DUCKER, JUDGE:
Claimants, Mary Jane Starvaggi and Wilma Lee Morris, allege damages in the sums of $150,000 and $25,000 respectively, for injuries and medical expenses suffered when they were wounded by a bullet from an automatic rifle alleged as negligently and carelessly discharged by a former member of the Department of Public Safety of West Virginia who was proceeding to arrest on May 13, 1971 one George Daniel Lash near an abandoned Baltimore & Ohio Railroad tunnel at Littleton, Wetzel County, West Virginia.
The injuries sustained by the claimants were inflicted by the same bullet which pierced Wilma Lee Morris’ arm and shoulder and then entered the breast of Mary Jane Starvaggi, and the claims involve the same facts; hence these claims were by agreement consolidated for hearing and decision.
Although there may be slight unimportant variations in some of the testimony relating to the order in which the firing of guns occurred, practically all of the evidence as is hereafter stated is uncontra-dicted.
*179 George Lash, according to his testimony, was that he was “traveling through Littleton” down U. S. Route 250, after having been in that vicinity on that day and after having stolen from Donald Smith two chickens, but which he later paid for evidently in order to avoid criminal charges on that account, and that he had found shelter from the rain in the old tunnel known as the Marshall tunnel of the Baltimore & Ohio Railroad. He said the people around Littleton had become hostile to him and he had decided to leave. When he started cooking his chickens and “fixing up some dandelions” in the tunnel he was approached by a Constable, Ray Teagarden, who, he said, “gave him 45 minutes to leave railroad property”. In the meantime, Sergeant Richard Nicholson of the State Police stationed at Paden City received a call to come to Littleton to assist Trooper C. A. Bias and a Deputy Sheriff in apprehending a man in the Marshall tunnel. Bias said he was run off with the threat of being killed. Nicholson came to Littleton and met State Troopers Bias, Drain and Rader, and Deputy Sheriff Smith at the tunnel. Nicholson ordered Troopers Drain and Rader to the north end of the tunnel with Deputy Smith, and Nicholson and Bias went to the south end of the tunnel where Lash was and as they approached Lash he (Lash) proceeded to walk into the tunnel and toward the north end thereof. Nicholson called for Lash to stop and “he turned and looked and then went right on into the tunnel”, and Lash exited the tunnel on the north side. Trooper Drain and Deputy Smith were armed with pump shotguns and Trooper Rader with an automatic AR-15 rifle, which was described as the same as an M-16 army rifle used by the army in Vietnam. Lash walked past the three officers stationed on the north side of the tunnel and continued on with a white plastic jug in his left hand and a shotgun in the other. Trooper Drain came off the side of the tunnel and told Lash he was under arrest and asked him to lay down his gun. Lash turned about halfway around with his gun turned down, and Nicholson ordered the officers to hold their fire. Lash proceeded a little farther and started to swing around again, but not “clear around”, and stopped. Nicholson again ordered the officers to hold their fire, and Lash turned again and Trooper Drain, under order from Sergeant Nicholson to do so, fired a shot in the air as a warning shot. Then Lash proceeded out on a railroad trestle and as Lash started to turn the third time and as he “came around” the Deputy on the other side (left hand side) fired across just as Lash fired with his gun tipped down, in front of Trooper Drain, striking *180 Drain’s shoes and throwing dirt upon him. Deputy Smith fired just as Lash “came around” the third time when Smith thought Lash was going to shoot. Nicholson “couldn’t tell just when it (Lash’s gun) went off, because he (Lash) turned to shoot”. After Deputy Smith fired at or about the same time Lash fired, Drain fell over backwards and as he started to get up Rader opened fire with the AJR.-15 rifle. Lash testified that he got shot in the knee, hand and side from shotgun fire, and that when he got shot in the knee he “buckled up sort of and the gun went off over the tunnel in the air” and that when he fired he was facing the policeman and towards the mouth of the tunnel. Lash said his shotgun was an old one given to him by his grandfather and that he carried it for fear he might “get mugged”, and that he had not cocked the gun to fire it but he “supposed it just went off under the weight” when he collapsed. From these facts it is apparent that the officers were faced with a situation which at the time appeared to be one in which a person carrying a shotgun which was somehow fired threatened their lives after having previously failed to halt after two previous commands to do so.
Whether the officers were originally acting legally in the matter could well depend upon whether a warrant had been issued for the arrest of Lash. Counsel for the claimants attempted to show that the officers acted without a warrant against Lash for stealing chickens worth only a dollar or two and constituting only a misdemeanor requiring a warrant. The officers contend that the emergency justified the arrest without a warrant because Lash had threatened and attempted to shoot them.
The evidence as to the existence of a warrant is not as positive as it should have been. Sergeant Nicholson was told that there was a warrant but he did not see it. However, the fact that he did not see the warrant before the arrest, does not preclude the fact that a warrant had been issued. Trooper Drain testified positively that the Deputy Sheriff had a warrant prior to the shooting for the arrest of Lash, that he was advised that a warrant had been obtained'by the Deputy and by Trooper Bias and that he saw the man give the Deputy a piece of paper but that he did not look at it. The witness, Donald Smith, from whom Lash had stolen chickens, stated he did not want to press charges against Lash but that one of the State Troopers asked him to swear out a warrant, and he had the warrant laying on the dash of his pickup and his son took it out and gave it to “them” *181 (evidently meaning the officers) after the shooting stopped. The warrant which was issued at Hundred, West Virginia, could well have been issued prior to the shooting and the fact that it was in existence at the time of the shooting may have been sufficient inasmuch as Lash did not demand to see it. Inasmuch as our decision in this case does not rest upon a determination of the warrant question there is no need for us to pass judgment upon such question.
Our decision of this claim might well have rested either upon the fact that the officers were under the circumstances of threats or actions of Lash showing an apparent intent to kill them or upon the warrant question and the validity of the actions of the State Police, had it not been for the questionable conduct of Trooper Rader. Such conduct itself involves the real basis of the injuries suffered by the claimants.
The fact that the claimants were struck by a bullet from an AR-15 automatic rifle and that Trooper Rader fired such a weapon at the time and place of the shooting at the Marshall tunnel has been proved, we think, beyond any doubt. That such a rifle was capable of firing a .223 Remington cartridge with a 55 grain bullet at a velocity of 3200 feet per second with a trajectory of a drop of not more than two inches in 300 feet, the approximate distance of the Statlemire home in which claimants were at the time they were wounded, was proved by a well qualified expert witness in the person of Colonel Edward B. Crossman, of Alexandria, Virginia. The rifle fired by Trooper Rader was one which had semi-automotive and automatic firing, the semi-automatic requiring a pulling of the trigger for each shot, and the automatic firing in rapid succession all the bullets in the magazine as long as one holds the trigger. That the Statlemire house was struck by bullets from such a rifle fired from the direction of the tunnel was testified to by N. James Schellhase, a civil engineer and surveyor of Wheeling, West Virginia.
Lash’s presence and movements in the village of Littleton had apparently created such a situation as to attract the attention of many people to see what would happen when the officers proceeded to arrest him in or about the tunnel, and the claimants decided that they could see what might happen from the bedroom window in the home of their grandmother, which home has been referred to as the Statle-mire home. They acted as did all others who had gathered along the road adjacent to the railroad and near the tunnel, and practically it *182 cannot be said they invited injury to themselves or assumed the risk of being shot, particularly when they were in a rather distant house of their close relatives and not out on the street or other proximity to the scene of the shooting.
The real question upon which the decision of this case rests is whether the conduct of Trooper Rader in the firing of his automatic rifle amounted to such negligence as to place liability for the consequences on the respondent.
Trooper Rader was a young member of the State Police force, twenty-three or twenty-four years of age, and according to the report made of the Littleton incident it appeared that it was thought he should have shown more signs of maturity than he did and as testified to by one witness “in some respects he is like a small boy”. It is difficult to conceive of any necessity for the officers to have seen any need for the use of the automatic firing of a rifle to apprehend Lash when a single shot or two could have killed him. Instead he fired the rifle or automatic and sprayed seventeen bullets in the direction of the Statlemire home with one of them wounding the claimants as they were looking out a window about 300 feet away. The testimony shows that the use by troopers of automatic rifles was generally confined to instances such as persons fleeing in automobiles where it was necessary to rapidly fire many bullets in order to hit the tires or other parts of a moving vehicle, not in instances where dead aim is sufficient on an individual or an object. While it is difficult to say what one should do in moments of peril and possible danger to one’s life, we are of the opinion that there was wanton negligence on the part of Trooper Rader, and those who suffered injuries and damages as the result of such negligence should be compensated.
The injuries sustained by Mary Jane Starvaggi are serious in that her right breast and her right arm have been permanently scarred and partially destroyed, while those of Wilma Lee Morris are not nearly so substantial, though leaving a permanent scar.
We accordingly award Mary Jane Starvaggi a total of $25,000.00 and Wilma Lee Morris a total of $1,500.00.
Awards of $25,000.00 to Mary Jane Starvaggi and $1,500.00 to Wilma Lee Morris.